## BOYD v. TOPHAM.

No. 2744.   Decided Sept. 4, 1915. Rehearing denied Nov. 20, 1915.
(152 Pac. 1185.)

1. APPEAL AND ERROR—MATTERS REVIEWABLE—QUESTIONS FOR JURY.
Where there was a direct conflict in the evidence, the question
was for the jury, and its determination will not be reviewed on
appeal.   (Page 228.)

2. LANDLORD AND TENANT—LEASES—LEGALITY OF OBJECT—HOUSES OF
PROPOSITION—EVIDENCE.   Where plaintiff landlord, on renting
the premises to the defendant, was informed that defendant in-
tended to use them for houses of prostitution, and thereupon
rented the premises to the defendant, including the stipulation
in the lease that the premises should not be used for im-
moral purposes, and after the defendant took possession, plain-
tiff often went to the disorderly houses to collect rent, and
had ample opportunity to observe their conduct and the per-
sons then in them, and the rental was for an exorbitant
amount, the plaintiff had such knowledge of the intended and
actual immoral use of the premises that she will not be per-
mitted to cover a balance due and unpaid on the rent.   (Page
232.)

3. DISMISSAL AND NONSUIT—CAUSE OF ACTION—ILLEGALITY—DIS-
CRETION OF COURT—PUBLIC POLICY.   Where on the trial below
it appears that the contract sought to be enforced is contrary
to public policy, the court on its own motion should dismiss
the action, regardless of whether the parties request it.   (Page
235.)

Appeal from District Court, Third District; Hon. *C. W.
Morse*, Judge.

Action by Polly A. Boyd against Dora B. Topham.

Judgment for plaintiff.   Defendant appeals.

REVERSED and REMANDED, with directions.

*B. N. C. Stott, T. Marioneaux*, and *Powers and Riter* for
appellant.

*Stewart, Stewart & Alexander* for respondent.

## APPELLANT'S POINTS.

Lease cannot be enforced if made for the purpose of violating law. And it is so whether the illegality appear upon the face of the lease, or is proved by evidence *aliunde*. (*Dougherty* v. *Seymour* (Colo.), 26 Pac. 823; *State* v. *Wilson* (Kan.), 84 Pac. 737, 117 Amer. State Rep. 497 [Note B on page 509]; *Third National Bank of Sandusky Ohio,* v. *Smith* [N. Mex.], 125 Pac. 632; *Standard Furniture Company* v. *Van Alstine,* 62 Pac. 145, 79 Am. St. Rep. 965, and note.) *Barnhart* v. *Goldstein* (Ind.), 59 N. E. 1067, when plaintiff "knew that his goods were purchased, or a lender knew his money borrowed for the purpose of being employed in the commission of a criminal act, injurious to society or its members" he cannot collect. (*Hanauer* v. *Doane,* 12 Wall. 342, 79 U. S. 342, 20 Law Ed. 439; *Luce* v. *Foster,* 42 Neb. 818, 60 N. W. 1027; Note in 32 Am. Rep. gives the history of the law up to 1878; 9 Cyc. 516 and 517. Agreement against public morals void *in toto,* no deed or writing can validate; 9 Cyc. 546. The Courts will not aid either party when contract is illegal.) Knowledge of leasing premises for an unlawful purpose makes the contract void, and there can be no recovery. (*Kelly* v. *Williams,* 162 Ill. App. 571.) Parol evidence varying instrument illegal with no estoppel to set up illegality. (*In re Canfield,* 190 Fed. 266.) Leasing house for purpose of prostitution, intending to use and so used, lessor cannot recover. (24 Cyc. 908; *Kessler* v. *Pearson,* 126 Ga. 725, 55 S. E. 963; *Eckles* v. *Nowlin,* 150 S. W. 794; *Hodson* v. *Walker,* 157 S. W. 104; *Thomas* v. *First National Bank* (Ill.), 72 N. E. 801.)

## STATEMENT OF FACTS.

This is an action to recover a balance alleged to be due for rent under a written lease entered into between the plaintiff and the defendant bearing date June 1, 1908. The property covered by the lease is Nos. 558 and 562 West Second South street, Salt Lake City, Utah. The improvements consisted of a brick building containing two or three storerooms on the ground floor and twelve or fourteen rooms upstairs. The value of the property was from $14,000 to $15,000. The lease

was for a period of ten years beginning with June 1, 1908, and ending June 1, 1918. The total amount of rent to be paid under the lease was $30,000, of which $1,000 was to be paid on the execution of the lease, $250 on October 1, 1908, and $250 on the 1st day of each and every month thereafter until the $30,000 should be paid in full. By the terms of the lease the lessee was required to pay for all repairs made on the premises and to insure the buildings and keep them insured against loss by fire in the sum of $5,000 during the life of the lease. She was also required to pay all the taxes and assessments, both general and special, as well as all other charges made against the property during the term of the lease, including reasonable attorney's fees in case suit should be brought for the enforcement of the lease. And it was further provided in the lease:

"That neither said demised buildings or premises, nor any part thereof, shall be used for any immoral purposes, or for any purpose prohibited by Salt Lake City, or Salt Lake County, or state of Utah."

It is alleged, in the complaint, among other things:

"That between the 1st day of June, 1908, and the 15th day of April, 1913, there has become due and owing from the defendant to the plaintiff under the terms and conditions of said lease the sum of $14,875, no part of which has been paid, except the sum of $9,300, * * * and that there is now due and owing from defendant to the plaintiff the sum of $5,575," with interest, etc.

It is also alleged that defendant failed to pay the "taxes, charges and expenses levied and assessed against said property, * * * amounting to the sum of $547.78." In the prayer of her complaint plaintiff asks judgment for the sum of $5,575, alleged to be due in the monthly installments of rent, with eight per cent. interest per annum on the alleged deferred payments, and for the sum of $547.78, the amount alleged to be due and owing from defendant to plaintiff for taxes levied against, and paid by plaintiff, on, the premises since the execution of the lease, and for $1,000 attorneys' fees, etc.

Defendant answered, and, among other things, alleged that:

"Plaintiff rented said premises to the defendant   *   *   * to be used by the defendant   *   *   *   for the purposes of ill fame or prostitution, and to be and become a part of the stockade or red light district,   *   *   *   and the defendant *   *   *   then and there entered into the possession and occupation of said premises   *   *   *   and used and occupied the same for the purposes of establishing, conducting, and maintaining houses of ill fame or prostitution and establishing the red light and stockade district for said purposes, and no other, all of which was known to the plaintiff long prior to making and entering into said lease and delivering of said property to this defendant, and that there was no other or different consideration given for said lease, and that said consideration and lease was and is against good morals and public policy, and said lease was and is null and void."

Defendant also pleaded an ordinance of Salt Lake City which is as follows:

"Section 460.   *Prostitution.*—It shall be unlawful for any person within the limits of Salt Lake City to

"Keep a house of ill fame resorted to for the purpose of prostitution or lewdness; or willfully reside in such house; or resort thereto for lewdness; or

"Be the owner of any building or tenement, the whole or any part of which is used for any of the purposes mentioned in the first subdivision of this section; or to have control of such building or tenement as agent, guardian, or lessee of such owner, or as the agent of such guardian or lessee, after notice of such improper use of such building or tenement, to fail to suppress the same by removing therefrom the occupants thereof; or

"To let any building or tenement, knowing that the lessee intends using the same, or any part thereof, for any of the purposes mentioned in the first subdivision of this section; or to harbor or keep about his or her private premises any whoremaster, strumpet or whore, knowing such person to be guilty of following a lewd course of life."

Defendant sought to interpose other defenses, but they are so lacking in merit that we deem it unnecessary to consider them.

The cause was tried to a jury, resulting in a verdict in favor of plaintiff for substantially the sums prayed for in the complaint. From the judgment rendered on the verdict, the defendant prosecutes this appeal.

McCARTY, J. (after stating the facts as above).

Appellant contends that the circumstances and conditions under which the lease was executed, as shown by the evidence, were such that the lessor (respondent) must have known when she executed the lease that the lessee (appellant) intended to, and would as soon as she took possession of the premises covered by the lease, use at least a portion of the buildings standing thereon as a house of prostitution. On the other hand, respondent insists that she understood and believed, when she executed the lease, the premises would be occupied and used by the lessee for legitimate purposes only, and that at no time between the 1st day of June, 1908, and the 15th day of April, 1913, the period for which rentals are claimed, was she advised that the premises, or any part thereof, were being used for immoral purposes. In view of the sweeping charges made on behalf of appellant of the culpability of respondent and the emphatic denials made on behalf of the latter in that regard, we have examined the entire record, and have carefully read all of the evidence contained in the bill of exceptions. The facts, as disclosed by the record, briefly stated, are about as follows:

During the winter of 1907-08, two men, A. H. Birrell and J. M. Evans, who were engaged in the real estate business in Salt Lake City, learned that the municipal authorities of said city were contemplating moving the proprietors and keepers of houses of ill fame and the women living therein from the then "red light district," so called, on Commercial street, to a "restricted" red light district in some locality within the city limits where the presence and avocation of this class of people would, in the opinion of the municipal authorities, be less offensive to public morals than on Commercial street. It seems that they also learned from some of the city's officers that the center of block 64, between First and Second South and Fourth and Fifth West streets, had been tentatively

fixed as the locality where the presence of the people of the red light districts would be the least objectionable from the standpoint of good morals. Birrell and Evans, therefore, immediately commenced obtaining options from the owners of land in block 64 for the purchase of their property. At first they represented to the property owners with whom they were negotiating that they intended to devote the land, when purchased, to trackage purposes. The real object for which the options were obtained and for which the land was being purchased became generally known to the public before the amount of land necessary for a red light district was secured, and the people generally became very much aroused, and much opposition was manifested to the scheme of establishing a red light district in block 64, and the opposition in that section was especially pronounced. It appears from the record that before the execution of the lease the question was taken up and commented on by the Salt Lake City daily newspapers, and that a mass meeting was held by citizens who resided in the vicinity of block 64—the location of the then proposed restricted red light district—to protest against the district being established in that locality. Respondent testified:

That before the execution of the lease she called at the office of Birrell and Evans in company with her brother-in-law, J. R. Boyd (who also at the time was negotiating with Birrell and Evans for the sale of property owned by him in block 64), with the view of leasing to them the property in question; that she there learned for the first time that there was a move on foot to establish a red light district in block 64; that Birrell said to her, "We have been purchasing property all through the block, and are going to establish a red light district down there, and there is a woman in Ogden, good reliable woman, plenty of money, plenty of backing, property of all descriptions, and it is her that wants your property"; that he said he would put it into the lease that it would not be used for immoral purposes; that "after him, saying he was going to establish a red light district in there, I wanted counsel before I would consent to anything, and he says, 'All right, you get your attorney, bring him over,

and,' he says, 'I will talk with him, explain the matter to him.' * * * 'I got my attorney, and he told him the same as he did me. * * * My attorney talked to him. He explained the situation to him, how that was going to be a district down there in that block, and why they wanted this building. He says, 'We want it, of course; want these buildings around here, and will rent the buildings out for stores or such things as needed.' I never heard about the red light district until I went to the office and he [Birrell] spoke about it.''

She further testified:

''He told me there was a wealthy woman in Ogden who was going to look after that district. She was the party who wanted to lease my property. He wanted to get it for her. Q. And that party was Mrs. Topham? A. Yes, sir. Q. To whom you made the lease? A. Yes, sir.''

The evidence shows that at this interview between Birrell and respondent, which took place about June 1, 1908, the terms of the lease were agreed on. On June 12, 1908, the parties met at the office of the attorney of the Citizens' Investment Company, a corporation, and signed the lease. Appellant in the meantime (about June 1st) had taken possession of the premises in question, employed several lewd, abandoned women, and placed them in the upstairs rooms of the building, and was using and occupying the same as a brothel or house of ill fame. On this point the appellant, whose testimony is not disputed, testified:

''We were in the building prior to the signing of the lease'' in the attorney's office. ''The building was being used at that time for sporting girls. I rented several rooms to the girls. * * * I had my office there all summer and part of the winter of 1908. The building was occupied for a sporting house of prostitution.''

As hereinbefore stated, four months' rent ($1,000) was paid by appellant to respondent at the time the lease was signed. This paid the rent from June 1 up to and including September 30, 1908. From September 30 up to and including the month of June, 1909, respondent received the rent ($250) each month from the attorney of the investment com-

pany, during which time appellant and her associate in promoting lewdness and debauchery, a corporation known as the Citizens' Investment Company, inclosed this red light district by a brick wall (respondent's property being within the inclosure), and constructed within the wall or "stockade" from 125 to 150 single rooms referred to in the bill of exceptions as "cribs." Each of these cribs was occupied by a lewd and abandoned woman for the purposes of prostitution, who paid therefor a certain amount of rent to appellant. During the first twelve months of the lease suits were commenced by certain parties to have this red light district abated as a public nuisance and the stockade closed. On this point respondent testified in part as follows:

"I heard of the suit in the fall of 1908 and spring of 1909. Of course, I read it in the newspapers; knew they were in court repeatedly attempting to close the stockade. After July, 1909, I went to Mrs. Topham's office occasionally. I was there myself a number of times. I can't tell how many. Q. When you went there you saw her in the stockade office didn't you? A. Yes. Q. You knew that they were then trying to close the stockade's use for prostitution purposes at the time you went for the lease money? A. Yes, sir. Q. You went there and collected rent right along, didn't you? A. After that (July, 1909) I went and collected the rent."

She also testified that she knew a high wall was built on the west side of her property to cut off the premises that were being used as a stockade from adjoining properties.

Some time prior to November, 1912—the date is not disclosed by the record—appellant moved out of the stockade, leaving the upstairs rooms of plaintiff's property, which were being used and occupied by lewd women for prostitution, in charge of a sporting woman by the name of Ross. On and after November 11, 1912, respondent went to the stockade and personally collected rent for the upstairs rooms from the Ross woman. Several witnesses testified that they conversed with the respondent about the time the lease was signed, and that she was informed and knew that Mrs. Topham intended to and would occupy and use the upstairs rooms of the property in question for a brothel and a house of ill

fame.   This evidence was denied by respondent, thereby creating a conflict which was for the jury to decide; hence we shall not review it.

It will be seen from the foregoing facts, which are not in dispute, we have a case:   (1)  Where property of the value of from $14,000 to $15,000 is leased for ten years for $250 per month, the lessee paying the insurance on the property, all taxes, both special and general, and for all improvements and repairs made on the property during the life of the lease, that is, the rent on the premises under the lease is equal to 20 per cent. interest per annum on the capital invested, or 8 per cent. per annum in excess of the rate of interest permitted by contract in this state; (2) where the lessor knew at the time she executed the lease that it was the intention of the lessee to establish and maintain a red light district consisting of houses occupied and used for the purposes of prostitution, and that the property leased would form a part of, and be partially surrounded by, the red light district, and, if not actually used for prostitution, would be used in connection with other property actually used for that purpose and in furtherance of the scheme to establish and maintain the red light district; (3) where the property, soon after it is leased, is inclosed by a wall or stockade that surrounds and isolates the red light district from adjoining property; (4) where the people living in the immediate vicinity of the red light district first bitterly oppose its establishment, and later on bring suits to have it abated as a nuisance, all of which it known to the lessor; (5) where, after the red light district has been maintained for thirteen months, the lessor went to the office of the lessee, which was within the stockade, and personally collected the rent paid by the lessee under the lease, and later on personally collected the rent from the prostitutes who were occupying and using a part of her property for the purposes of prostitution.   We think the only inference permissible from the evidence is, that the property in question could not have been leased for a legitimate purpose for a sum sufficient to pay twenty per cent. interest on its market value.   The fact that the party leasing was willing to pay the exorbitant rent provided for in the lease

was a suspicious circumstance and very persuasive that she intended to, and would, when she obtained possession of the premises, make an unlawful use of them. The exorbitant rent, we think, also tends to explain why respondent closed, or pretended to close, her eyes to the use that appellant made of the property, and seemingly acted upon the theory that, "where ignorance is bliss, 'tis folly to be wise." Respondent's attitude may be more aptly illustrated by paraphrasing the foregoing to read, "where ignorance is profitable, 'tis folly to be wise." We may, however, for the purposes of this case, assume—an assumption not warranted by the admitted facts—that respondent for the first 13 months the property was occupied by appellant under the lease, namely, from June 1, 1908, until June 30, 1909, was not advised and did not know that the property, or any part thereof, was being used for immoral purposes. During these 13 months respondent was paid the rent ($250 per month) provided for in the lease; hence there is no controversy regarding the payment or alleged nonpayment of the rent during that period. During the time, however, that respondent went to the stockade (which, the record shows, was from July 22, 1909, until April 11, 1913) and personally collected the rent from appellant and the sporting women occupying the upstairs rooms of the building as tenants of appellant, she must have known—in fact, we do not think the admitted facts will justify any inference other than that she could not, under the circumstances, help knowing—that the upstairs rooms of her building were being used as a house of ill fame. The notoriety of appellant, the publicity given her resort by the Salt Lake City daily newspapers, the mass meetings held by indignant citizens to protest against its maintenance and to devise means of abolishing it, the actions at law brought to abate is as a public nuisance, and the monthly visits or calls made by respondent to the resort to collect rent under the lease from appellant and the dissolute women who, as tenants of appellant, were occupying and using the leased premises for prostitution, as shown by the undisputed evidence, absolutely precludes a finding that respondent was ignorant of the uses that were being made of her property. In fact, respondent, in

her printed brief, makes it clear that she could not have been deceived or misled in that regard. Commenting on appellant and her career of immorality, respondent, speaking through her counsel, in her printed brief, says that:

She "built the notorious stockade with its hundreds of cribs and vile dens of sin, iniquity, vice, and ungodliness, where depraved humanity basked in all of its most horrifying and vicious .forms. She published herself to the world as trafficking in sin to such an extent that the whole community arose up against her and had her vile dens removed.  *  *  * Her life of shame and dishonor had been paraded before the public for twenty years. She was known throughout the community and believed generally to be guilty of all the vices a wily, cunning, crafty, and depraved woman could resort to. The nature of her vile business presupposes that either di- .rectly or indirectly she personally, or through her parasitical emissaries, resorted to all the infamies known to her associates in the underworld.  *  *  *  Bell London! (Alias by which appellant was generally known.) How comprehensive this name! London—the Metropolis of the World. Bell— the Bell of that Metropolis; the King Pin of the Tenderloin; the Mother of 'Harlots; the Queen of the Underworld; the Refuge of Crooks and Criminals; the Despoiler of Homes; the Enemy of Virtue; the Promoter of Vice.  *  *  *  For twenty-four years, without regard for and in defiance of the laws of God and the laws of man, she admittedly carried on her vile and corroding business, a conspirator in crime, a promoter of iniquity? As this woman looks back upon her past life, what terrible scenes must force themselves upon her! How the pallid faces of myriads of fallen women and weak men, vizored in sorrow, scourged and blotched in face and form by prostitution's poisonous fangs, must, like a nightmare hot from hell, in a horrible dream, appear in ghastly form before her. But, unlike the nightmare of a horrible dream, it shall not pass away.  *  *  *  One only need go to the stockade and see the cribs this woman built for human beings to inhabit by wallowing in filth and corruption, and the imagined respect and forced confidence in this woman's

integrity all vanish in disgust and humiliation at the depth to which human degradation can go."

But counsel argue that:

"It was expressly provided in the lease that it should not be used for immoral purposes. She had to lease it to somebody or let it stand idle, and, by Mrs. Topham bringing the red light district in that vicinity, it would be impossible for Mrs. Boyd to lease it to other than a foreign **3** element, or perhaps an undesirable element, for no desirable element would remain in the vicinity of the red light district, and so Mrs. Boyd did all that she was called upon to do. She was told that her property would not be used for immoral purposes, but for stores and respectable tenants."

Now, if the foregoing observations made by respondent and her counsel correctly reflect the evidence bearing on the character and dissolute life of appellant and the publicity of the resort, the condition and the manner in which it was maintained—and we are not prepared to say that they do not— then it is idle for respondent or her counsel to contend that she honestly believed that any part of the resort was occupied and used by "respectable tenants." In the opinion of the writer a landlord who knowingly permits his leased premises to be used by the tenant in violation of the penal statutes of the state or of the ordinances of the municipality in which the property is situated is just as culpable from a moral point of view as the tenant. It would be a work of supererogation to cite the many authorities which hold that contracts of the kind here involved, under which the penal statutes of the state or the ordinances of a municipality are violated with the knowledge of the lessor, cannot, on ground of public policy, be enforced. When it developed at the trial that respondent must have known that the leased premises were being occupied and used as a brothel, the court, even though its action was not invoked by either party, should have stopped the proceedings and dismissed the action.

The cause is remanded, with directions to the trial court to vacate the judgment and dismiss the action.

Costs to appellant.

STRAUP, C. J., and FRICK, J., concur.